496 A.2d 802

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Walter DIXON.**

Superior Court of Pennsylvania.

Argued March 27, 1985.

Filed Aug. 2, 1985.

Petition for Allowance of Appeal Granted Jan. 14, 1986.

294

Susan V. Kahn, Assistant District Attorney, Philadelphia, for Commonwealth, appellant.

Thomas I. Puleo, Philadelphia, for appellee.

Before SPAETH, President Judge, and JOHNSON AND SHOYER *, JJ.

SPAETH, President Judge:

This is a Commonwealth appeal from judgment of sentence for third degree murder of 11½ to 23 months in prison (with credit for just under 9 months time served) followed

* The Honorable Kendall H. SHOYER, Senior Judge of the Court of Common Pleas of Philadelphia County, is sitting by designation.

by 10 years probation. The Commonwealth argues that the sentence is unreasonably lenient and unreasonably deviates from the recommended minimum ranges provided in the Sentencing Guidelines, 204 Pa.Code § 303.1 *et seq.* On the record as it now stands, we agree. We therefore vacate judgment of sentence and remand for resentencing consistent with this opinion.

## –1–

■ Initially we must determine whether the Commonwealth's appeal is properly before us. *See Commonwealth v. Drumgoole,* 341 Pa.Super. 468, 491 A.2d 1352 (1985). Under 42 Pa.C.S. § 9781(b), the Commonwealth may appeal the discretionary aspects of a sentence by filing a petition for an allowance of appeal; a notice of appeal will serve the same purpose as a petition. *See* Pa.R.A.P. 902, Note. Here, the Commonwealth initiated the appeal by filing a timely notice of appeal. Even so, we may entertain the appeal only if "it appears that there is a substantial question that the sentence imposed is not appropriate...." 42 Pa.C.S. § 9781(b); Pa.R.A.P. 341, Note. As will appear from the ensuing discussion, the record does raise such a question. The Commonwealth's petition for appeal is therefore granted.

## –2–

On August 22, 1983, appellee entered a guilty plea to an information charging him with murder and voluntary manslaughter. The Commonwealth stipulated that the facts would support an adjudication no higher than third degree murder. R.R. 2a. During the plea colloquy, the prosecutor summarized the factual basis of the plea, as follows. R.R. 23a *et seq.*

The victim was James Smith, a 57 year old taxi driver. On March 24, 1983, appellee and his girlfriend engaged Smith to drive them to various places; several others were with them. In the course of the afternoon they bought a bottle of vodka. The bottle was passed around in the car and Smith was among those who drank from it; the autop-

sy report disclosed that his blood alcohol content was .20. After some time, on a Kentucky Fried Chicken parking lot, Smith's passengers asked him to take them farther, but he objected, stating that he wanted more money. An argument between Smith and appellee ensued. Appellee pulled Smith out of the car. Smith had a knife, and he cut appellee with it, gashing him about an inch and a half in the forehead. The two men struggled. Smith went down, and appellee and his girlfriend walked away. When appellee realized that his forehead was bleeding, he went back, stabbed Smith in the chest, and kicked him several times. R.R. 23a–26a.

In support of this description of the incident the prosecutor identified the witnesses she expected to call and summarized the testimony she expected them to give.

One of the passengers in the car was Jessie Breedlove. He was a friend of Smith's. The prosecutor stated that he would testify: that Smith was so drunk he could barely stand and some one else had taken over the driving; that he was in the back seat with Smith before appellee pulled him out; that Smith and appellee each had a knife; that he saw appellee go back to Smith while Smith was on the ground "and saw him kick him. He did not see him stab him at that point." R.R. 27a.

Stuart Hill was working at a tire business across the street from the Kentucky Fried Chicken. The prosecutor stated that he would testify that

> he knows none of the people in the case. He was working there; he changes tires. And he saw a fight going on. He heard an argument. He saw the younger man, the defendant, hit the older man, Mr. Smith; saw the defendant walk away, come back, and stomp the victim while he was on the ground.... He did not [see him stab]. He called the police.

R.R. 27a–28a.

John Knittel was on the Kentucky Fried Chicken parking lot. The prosecutor stated that he would testify that

[he] does not know any of the parties involved; that he saw the older man with a knife, he saw the younger man with a knife. He saw the older man trying to get up after he had already been knocked to the ground. Saw the defendant come back and hit him at least five or six times with a knife in his hand, hitting him and kicking him in the head.

R.R. 28a.

The prosecutor then added, evidently still referring to Knittel's expected testimony:

When the defendant came back, he said to the older man, the decedent, "Look what you've done to me," indicating the blood on his head, started to swing at the old man. That's when he had the knife in his hand, while he was swinging.

R.R. 28a–29a.

The prosecutor then further added:

Your Honor, in addition to what I have mentioned, John Knittel would testify—and I quote from his statement: "I was going to help the guy till I saw a knife in his hand. Then the young guy"—meaning the defendant—"I saw next to the car came from behind me. He was pointing to his head and said to the old guy, 'Look what you did to my eye.' I could see blood around the guy's eye. By this time, the old man had gotten up. Then the young guy started to swing a knife at the old guy. The old guy kept backing up. The old guy went down. Then the young guy started to kick the old guy in the head."

R.R. 30a.

Geraldine Nash was among the passengers in the car. The prosecutor stated that she would testify that

the defendant came back after the initial fight. "Walter came back while J.C."—meaning the decedent—"was on the ground. He stabbed J.C. in the face, and he kicked J.C. in the head a couple of times." This was after the initial confrontation.

R.R. 31a–32a.

Defense counsel then made several comments on the evidence.

Counsel first commented on Knittel's statement:

[I]t seems there's some question about when in fact Mr. Smith was actually stabbed in the chest in this case. Mr. Knittel is asked, "When the younger guy started to swing a knife at the old guy, did you see him stab the old guy?" And Mr. Knittel answered: "I could see him making contact with the old man's body. He hit the old man five or six times."

He never said that Mr. Dixon ever in fact stabbed Mr. Smith at that point.

R.R. 32a.

Defense counsel next stated that there was another witness, not identified by the prosecutor, one Doris Barco:

Miss Barco was also present inside the cab. She stated that while the tussle was going on, and James Smith and Walter Dixon were going at each other, she said Walter had swung his fist first at J.C., but missed. Then when J.C. swung the knife and cut Walter on the head, Walter grabbed his head and you could see blood on his hand. Then Walter charged J.C. and punched him and knocked him on the ground and grabbed J.C.'s arm and twisted the knife and stabbed J.C. on the ground.

R.R. 32a–33a.

To this, the prosecutor added:

In addition, Your Honor, she would also testify that she asked the defendant not to go back once he had walked several steps away.

They had walked at least I believe she would say about 20 feet. She said. "Walter, come on, let's go," but the defendant, realizing he was cut, went back and fought some more.

R.R. 33a.

Defense counsel then referred to appellee's statement to the police, and in response to the court's request, summarized the statement. The prosecutor had earlier summa-

rized the statement as "indicating that he [appellee] swung at the decedent, hit him in the chest, but doesn't know exactly where he hit him." R.R. 29a. Defense counsel's summary was similar, adding some detail, in particular that "when J.C. started fighting me and cut me, I got to bleeding, that's when I started fighting him." R.R. 34a. When the court pointed out that, as summarized, the statement included no admission to the stabbing, defense counsel stated, "He admits stabbing the decedent." R.R. 35a. The court then asked appellee, "But you do admit that you stabbed this gentleman?" to which appellee responded, "Yes." *Id.*

Finally, defense counsel stated that appellee did not agree with the prosecutor's statement that he had pulled Smith from the car. When the court asked, "What happened instead?" counsel responded, "J.C. had gotten out of the car voluntarily, and the two had met on the outside." R.R. 36a.

After accepting appellee's plea, the court stated that it wished to reserve its adjudication on whether the offense was third degree murder, as the Commonwealth contended, or voluntary manslaughter, as the defense contended. On August 29, 1983, the court concluded that the facts supported an adjudication of third degree murder. On December 14, 1983, the court imposed a sentence of 11½ to 23 months in the Philadelphia County Prison, with credit for time served, followed by 10 years probation under the supervision of the State Board of Probation and Parole. The time served was just under 9 months, appellee having been in custody since his arrest on March 24, 1983. The Commonwealth filed a timely petition for reconsideration of sentence, which was denied. This appeal followed.

–3–

The Sentencing Guidelines, 204 Pa.Code § 303.1 *et seq.,* apply to offenses committed on or after July 22, 1982, *id.* § 303.1(d). Since the offense to which appellee pleaded guilty was committed on March 24, 1983, the trial court was bound to consider the guidelines. 42 Pa.C.S. § 9721(b); 204 Pa.Code § 303.1(a).

As required by 204 Pa.Code § 303.1(b), the record includes the Pennsylvania Commission's Guideline Sentence Form. The form records the "offense gravity score" for third degree murder as "10", and appellee's prior record score as "3", this latter score being recorded as deriving from a prior adult conviction for a felony drug offense. The form also records that because the offense was committed with a knife, a "deadly weapon enhancement" was applicable. *See* 204 Pa.Code § 303.4 (requiring at least 12 months and up to 24 months confinement to be added to the guidelines sentence). The form then records the three guidelines sentences (with the deadly weapon enhancement being taken into account): a "minimum range" of 84 to 144 months; an "aggravated range" of the statutory limit (that is, the longest minimum provided by law, which for third degree murder is 10 years in prison, 18 Pa.C.S. §§ 1103, 2502(c)); and a "mitigated range" of 66 to 96 months.[1]

Further sections of the Sentence Form provide for notation of the sentence imposed, and, when that sentence departs from the guidelines sentence, for a statement by the trial court of the reasons for the departure. Here, the trial court provided the following statement of reasons for departing from the guidelines:

[defendant] pleaded guilty—case had some overtones of self-defense—

has, since being incarcerated, begun G.E.D. study; he has participated in drug program and has prison job. The 's problems arise from drug dependency and he states he has given drugs up and will change.

The has employable skills and has a common-law wife and a small child who need his financial support.

N.B. * I have imposed a lengthy state probation.

In its opinion, filed in response to the Commonwealth's appeal, the court similarly explained:

In keeping the defendant in the county system the Court's goal was to avoid disruption of the defendant's

---

1. Without the deadly weapon enhancement, the "minimum range" was 72 to 120 months, and the "mitigated range" was 54 to 72 months.

good progress since his incarceration. He had begun a G.E.D. program, started drug rehabilitation and secured a job in prison. In following the County imprisonment with a lengthy State probation the Court sought to ensure the defendant's potential for progress.

Slip op. of tr. ct. at 5.

The court did not refer in its opinion to the "some overtones of self-defense" reason.

–4–

■ In reviewing a sentence outside the guidelines, we are to decide whether the sentence is "unreasonable." 42 Pa.C.S. § 9781(c)(3). *See Commonwealth v. Drumgoole, supra.* In making this decision, we must have regard for

(1) The nature and circumstances of the offense and the history and characteristics of the defendant.

(2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.

(3) The findings upon which the sentence was based.

(4) The guidelines promulgated by the commission.

42 Pa.C.S. § 9781(d).

Having considered these factors, in particular the nature and circumstances of the offense, the history and characteristics of appellee, and the trial court's findings as they relate to the guidelines, we are compelled to the conclusion that the sentence was unreasonable.

*First,* regarding the nature and circumstances of the offense:

As we have already noted, at the guilty plea proceeding, defense counsel argued that there was "some question about when in fact Mr. Smith was actually stabbed in the chest." R.R. 32a. At the sentencing proceeding, counsel repeated this argument, stating that "it's unclear when in fact he [appellee] did stab the decedent." N.T. 12/14/83, 11. This argument is specious, and was properly rejected by the trial court. The evidence at the guilty plea proceeding, which we have summarized in some detail, disclosed that after walking away from Smith, appellee, discovering

that he had been gashed in the forehead, and despite the entreaty of his girlfriend, returned to where Smith was lying on the parking lot and stabbed and kicked him. Appellee's own statement to the police, as summarized by defense counsel, was consistent with this description of the incident ("when J.C. starting fighting me and cut me, I got to bleeding, that's when I started fighting him").

When the trial court adjudicated the offense as third degree murder, on August 29, 1983, it filed no findings of fact. In its later opinion, however, in response to this appeal, the court included a "Statement of the Facts", part of which reads:

> Dixon left the fray, but when he discovered that he was bleeding from the forehead gash he went back to Smith, stabbed him in the chest and stomped him three or four times.

Slip op. of tr. ct. at 4.

These findings are supported by the record, and there can be no question that in adjudicating the offense as third degree murder, and not voluntary manslaughter, the trial court was correct.

In imposing sentence, however, the trial court inadequately considered and inaccurately characterized the nature and circumstances of the offense. In particular, in explaining its departure from the Sentencing Guidelines, the court stated that the offense "had some overtones of self-defense". While the record discloses that appellee was enraged because of the gash to his forehead it not only does not support but contradicts any claim of self-defense.

Also in this regard, at the sentencing proceeding the court stated, "He [appellee] would not have killed this man if he had not been high on whatever he was high on that day." N.T. 12/14/83, 10. Neither does the record support this statement. There was evidence at the guilty plea that a bottle of vodka "had been passed around" among Smith and the passengers in his cab, R.R. 25a, and that Smith himself was "too drunk to drive", R.R. 26a, but there was no reference, either by the prosecutor in her statement of

the evidence or by defense counsel in his, to appellee being "high", or drunk. We note that after an unrecorded side-bar discussion, R.R. 42a, defense counsel requested an alcohol evaluation and the prosecutor a drug and alcohol evaluation, *id.*, and recognize that conceivably something was said off the record regarding appellee's condition. As the record stands, however, nothing supports any finding other than that appellee was enraged by being gashed on the forehead. In this regard, we note that in its opinion the trial court, while finding that appellee and the others "had indulged" in the vodka, slip op. of tr. ct. at 3, made no finding that appellee was under the influence either of drugs or alcohol.

*Second,* regarding appellee's history and characteristics:

At the sentencing proceeding the trial court stated:
[H]e [appellee] has had a history of drug involvement which is ridiculous because he's really a good person, he can work, he has held good jobs and all of this, but he had been in and out of the courts, and in and out of jails because of his dependence on drugs. And he has taken barbituates by the fistfuls, and heroin and marijuana and cocaine.
N.T. 12/14/83, 7.

A copy of the presentence report is included in the record as an exhibit to the Commonwealth's petition to reconsider sentence. It discloses a somewhat different evaluation of appellee's history and characteristics, in particular regarding appellee's dependence on drugs.

As requested at the guilty plea proceedings, the presentence report includes a section on appellee's use of drugs and alcohol:

### DRUG AND ALCOHOL HISTORY:

**DRUG:**
The Defendant stated that over the past seventeen years he has been using heroin, cocaine, barbituates and marijuana on a regular basis and in varying amounts.

He reported that he used heroin to the extent of two bundles a day but terminated this use in August of 1982. At that time he entered the A.C.T. drug program and was placed on methadone maintenance. He claims to have been attending this program up until his incarceration but could not recall his counselor's name.

The Defendant indicated that he would use cocaine on a social basis and not often. His use of barbituates was by the "handful" and often with the heroin. He used marijuana on somewhat of a regular basis but not a daily one. Neither the Defendant's mother or his most recent paramour had any personal knowledge of drug use by the Defendant. Ms. Barco did not know that he had been attending the drug program, however.

The Defendant had applied for admittance into the drug counseling program at the prison and was recently admitted. He receives group counseling once a week according to his caseworker, Idelle Williams.

**ALCOHOL:**

The Defendant reported that he has been using alcohol since he was twenty-two years of age. He stated that he usually drank in combination with his drug use but did not drink very much. These statements do not appear to be consistent with those made to the Court psychologist in which he reported consuming a quart of wine and or rum a day.

Earlier sections of the presentence report discussed, among other matters, appellee's health and marital and employment history. Generally stated, this was that appellee had stated that he was in good health; that he had fathered five children, by his wife, who divorced him in 1976, and by two other women with whom he later lived, the second of these being Doris Barco, who was in the car and was referred to at the guilty plea proceeding as a witness; and that he was supporting these children from earnings of $500 a week in the home remodeling business, in which he

had worked since 1976, and $100 a week selling household items.

The Evaluation Summary of the presentence report concluded with these paragraphs:

The Defendant is in apparent good health and is suffering from no chronic illnesses. He has alleged a history of drug and alcohol abuse spanning a period of seventeen years, although at least two people close to him had no personal knowledge of this abuse. This period of abuse which reportedly involved two bundles of heroin a day as well as handfuls of barbituates occurred when he was working at least two full time jobs and later while profitting from the home remodeling business. It would seem that his use of drugs combined with his daily use of alcohol would have prevented him from maintaining any steady employment and is more than likely exaggerated. He does appear to have been receiving some drug therapy and is in counseling while incarcerated. None of these factors would appear to mitigate his behavior in the present case. He has been found competent to receive a sentence and to be "without psychotic disorder."

As an adult, the Defendant has been arrested at least fourteen (14) times with seven (7) convictions and three (3) commitments. He has two matters still open in Bucks County where he has been considered a fugitive since 1976. He has at least one known juvenile arrest and his prior record score has been determined to be *3*.

The Defendant does not appear to be a good risk for a probationary sentence. The very viciousness of his behavior in the present case would indicate that such a sentence would be inappropriate. In addition, he has a history of arrest and incarceration, including a prior manslaughter offense, spanning fifteen years which has not deterred him from continued criminal behavior. He has a history of violence which has escalated into the events of the present case and which may never be controlled. Consequently no matter what sentence the Court chooses to impose there appears to be little chance that the Defendant will successfully complete it.

At the beginning of the sentencing proceeding the court referred briefly to the presentence report. The court stated that it did not understand the last sentence of the Evaluation Summary, and asked that the author of the report be called. N.T. 12/14/83, 3–4. (Apparently he could not be reached, for he did not appear at the proceeding.) Appellee was then brought into the courtroom, and the following colloquy ensued:

THE COURT: All right, Mr. Dixon, you pleaded guilty to murder in the third degree. It was a very unfortunate and tragic episode, and I have every reason to believe that it's directly related to your drug problem.

THE DEFENDANT: Yes.

THE COURT: I have every reason to believe you were very high that day.

THE DEFENDANT: Yes, I was.

THE COURT: And it is sad. You have been on drugs nearly all your adult life.

THE DEFENDANT: Yes, but I'm going to change.

THE COURT: How are you going to change?

THE DEFENDANT: I'll quit. I won't do no more drugs, none.

N.T. 12/14/83, 4–5.

Later in colloquy the court asked appellee about "18 months [served] in Virginia", to which appellee responded that this had been for using heroin. *Id.,* 7–8. When the court observed, "That didn't do you very much good, did it?" appellee responded: "I learned my lesson. But since I've been in the program up Holmesburg [the Philadelphia County prison]—I'm getting older, I just turned 37 a couple weeks ago." *Id.* 8.

During its colloquy with appellee, the court heard brief testimony from Doris Barco, who had her son by appellee with her, and appellee's mother. In the course of colloquy with Ms. Barco, the court said, "And he [appellee] tells me that he was high", to which Ms. Barco responded, "Yes." *Id.,* 6–7. Appellee's mother stated that she wished to help

appellee, "that he have a place to stay, he can stay with me, you know, I'll help support him till he gets a job." *Id.*, 8. Ms. Barco then asked whether she could say something, and when the court said she could, stated:

First of all, his drug problem, one thing I can say, he never brought it—I have two other children, not by him. He never brought any drugs in the household. If he did, he never brought them in front of the children. He did use much discretion. And he was—I miss that financial help terribly because, like I say, I have two other children, and it's very, very hard, and any consideration you can give us would really be well appreciated.

*Id.*, 8–9.

Defense counsel then presented argument. In the course of his argument he directed the court's attention to appellee's employment record, and stated that while in prison, appellee had been working towards a general education diploma, adding:

in fact, he's employed in prison in the annex and he's been doing well there, and he's taking part in the drug program there.

I'm not saying that has now cured him and he's ready to be released into society, but he's making some progress in prison, so I don't know exactly what the evaluator [the author of the presentence report] means by this [the evaluation in the report].

*Id.* 12–13.

The argument on behalf of the Commonwealth was limited. At the opening of the sentencing proceeding the prosecutor indicated that the Commonwealth had agreed to make no recommendation regarding sentence. *Id.*, 2. The prosecutor confined himself to directing the court's attention to the evaluative summary, *id.*, 12, and to suggesting to the court that it was "bound by the mitigated minimum range," *id.*, 15. With respect to the first argument, the court stated that it "ha[d] no faith" in the presentence investigator's, or anyone's, predictions of behavior, adding, "You just have to go by what you think is right," *id.*, 12; and with respect to

the latter, that the court could depart from the Sentencing Guidelines so long as it stated its reasons for the departure, *id.*, 15.

The court then imposed sentence. We have already, on pages 10–11, above, quoted the court's statement of its reasons for the sentence, as stated both on the Sentence Form and in the court's later opinion, and will not repeat the reasons here. Central to the court's reasons was the court's appraisal of appellee as a person who was drug dependent and had committed the offense while high on drugs but who was making "good progress" in the County prison toward overcoming his dependency. "In keeping [appellee] in the county system," the court stated, its "goal was to avoid disruption" of this good progress, and "[i]n following the County imprisonment with a lengthy State probation the Court sought to insure [appellee's] potential for progress." Slip op. of tr. ct. at 5.

This appraisal of appellee's history and characteristics is not supported by the record.

Beyond appellee's own statements at the sentencing proceeding, there is no evidence to support the court's suggestion to appellee that he was "very high" on drugs when he committed the offense, and that the offense was "directly related to [his] drug problem." The presentence report, moreover, raised factual issues that should have been explored: If appellee was indeed dependent on drugs, how was it that he was in apparent good health and able to earn $600 a week, working two jobs? Was the report correct in stating that "[n]either [appellee's] mother [n]or his most recent paramour had any personal knowledge of drug use by [appellee]"? (The testimony of the mother and Ms. Barco at the sentencing proceeding did not contradict this statement; Ms. Barco's statement was consistent with it.)

Certainly a court is free to reject a presentence report's evaluation of the defendant. The rejection, however, must not be arbitrary or unexplained, or else the presentence report cannot serve its purpose. As the record stands now, it not only does not contradict but supports the statement in the presentence report that appellee's claimed history of

drug and alcohol abuse was "more than likely exaggerated."

If we assume, however, that appellee was drug dependent and that his offense was directly related to his drug problem, still, there is no evidence to support the court's appraisal of him as making "good progress" in overcoming his dependency.

The record discloses virtually nothing regarding appellee's participation in the drug counseling program in the County prison; defense counsel himself only claimed that appellee was "making some progress", and made it plain that he was "not saying that has now cured him and he is ready to be released into society." Surely no reliance could be placed on appellee's assurances that he had "learned [his] lesson," and "I'll quit, I won't do no more drugs, none." Nothing is more typical of drug dependency than the inability to honor such assurances.

Moreover, again the presentence report raised factual issues that should have been explored, before any appraisal was made of appellee's "potential for progress." According to the report, appellee has a history of fourteen arrests, seven convictions, and three commitments; one of these incidents is characterized as a "manslaughter offense." The report's appraisal of appellee's potential for progress was that "[h]e has a history of violence which has escalated into the events of the present case and may never be controlled." This appraisal may have been exaggerated; the record as transmitted to us does not include a copy of appellee's prior criminal record, and at the guilty plea proceeding the prosecutor stated that "[i]n all honesty, Your Honor, it's not a significant record." R.R. 41a. Nevertheless, without inquiry into what in fact was appellee's prior criminal record, a reasoned appraisal of appellee's ability to overcome his asserted drug dependency was impossible.

One further comment regarding the court's appraisal of appellee's "potential for progress" is required. As mentioned, appellee had been in custody in the County Prison since his arrest, or just under 9 months. Since the court

gave him credit for this period, the minimum sentence of 11½ months made appellee eligible for release from prison in about 2½ months. Assuming that indeed appellee was as drug dependent as the court indicated, we can find no basis in the record to suggest that in so short a period he would be able to overcome his dependency sufficiently to bring it under a reasonable degree of control.

*Finally*, with respect to the sentencing guidelines:

The court was entirely correct in stating to the prosecutor that the three guideline sentences—the minimum range of 84 to 144 months; the aggravated range of the statutory limit, or a sentence of 10 to 20 years; and the mitigated range of 66 to 96 months—were

> not mandatory sentences. If I deviate from the guideline, I just have to write out why I have deviated and the reason I have deviated. There's a section 8 called a Departure Report.

N.T. 12/14/83, 15.

However, having considered the reasons the court did write out in section 8 of the Sentence Form, we are unable to accept them as sufficient to show that the sentence was a reasonable one.

For purposes of discussion we may assume that a sentence in the mitigated range would have been reasonable. Still, the sentence as imposed plunged more than 54 months below the floor of the guidelines' mitigated range, as enhanced as a result of appellant's possession of a deadly weapon. Nothing in the evidence presented at the guilty plea and sentencing proceedings, and nothing in the court's explanation of its sentence, supports such a departure. The Sentencing Code provides that "the court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b). With deference to the unquestionably broad discretion vested in a sentencing court, *Commonwealth v.*

*Jackson,* 336 Pa.Super. 609, 486 A.2d 431 (1984), we are compelled to the conclusion that the court here did not abide by this general principle. It, properly, adjudicated the gravity of appellee's offense as third degree murder. The confinement imposed, however, was not consistent but inconsistent with so grave an offense.

We must therefore vacate the sentence and remand for resentencing. 42 Pa.C.S. § 9721(b). On remand the court must ensure that it has before it "sufficient information to enable [it] to make a determination of the circumstances of the offense and the character of the defendant." *Commonwealth v. Doyle,* 275 Pa.Super. 373, 381, 418 A.2d 1336, 1340 (1979) (citing *Commonwealth v. Wicks,* 265 Pa.Super. 305, 401 A.2d 1223 (1979)). The court must then apply to this information the guidelines specified in the Sentencing Code, *see* pages 9–10, and explain on the record how that application has resulted in the sentence imposed. *Commonwealth v. Sypin,* 341 Pa.Super. 506, 510–511, 491 A.2d 1371, 1373–74 (1985); *Commonwealth v. Doyle, supra; Commonwealth v. Farrar,* 271 Pa.Super. 434, 447–53, 413 A.2d 1094, 1101–04 (1979).

Judgment of sentence vacated and case remanded for resentencing consistent with this opinion. Jurisdiction is relinquished.